UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2018 JUN 12 P 2: 59

STEPHEN C. DRIES
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

BRET NAGGS and
MARK WOGSLAND,

Defendants.

Case No. **18-CR-130**

# SEALED

Title 18 U.S.C. § 371
Title 15 U.S.C. § 78m(b)(2),(5)
Title 15 U.S.C. § 78ff(a)
Title 18 U.S.C. § 2
Title 17 C.F.R. § 240.13b2-2
Title 18 U.S.C. § 1349
Title 18 U.S.C. § 1348
Title 18 U.S.C. § 1343
Title 18 U.S.C. § 981(a)(1)(C)

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

#### The Defendants, Relevant Entities & Individuals

#### Roadrunner Transportation Systems, Inc.

1.    Roadrunner Transportation Systems, Inc. ("Roadrunner") was a transportation company that offered shipping and logistics services throughout North America.

2.    Roadrunner consisted of three primary operating segments:   (1) Truckload Logistics ("Truckload"), which provided pickup, delivery, freight consolidation and management for large volume shipments; (2) Less-than-Truckload, which provided similar services for smaller volume shipments; and (3) Global Solutions, which offered logistics services, including pricing,

contract management, transportation mode and carrier selection, and freight tracking. Roadrunner owned and operated several operating companies within the Truckload and Less-Than-Truckload operating segments.

3. Between May 2010 and January 2017, Roadrunner acquired more than twenty transportation companies. Roadrunner owned and operated those companies and incorporated their financial results into Roadrunner's financial results.

4. From in or around 2010 to in or around March 2017, Roadrunner's corporate headquarters was in Cudahy, Wisconsin, within the Eastern District of Wisconsin. As of December 31, 2015, Roadrunner had over 4,500 employees.

5. Starting in or around May 2010, Roadrunner's stock was traded publicly on the New York Stock Exchange ("NYSE"), a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934. Roadrunner's stock traded on the NYSE under the ticker symbol "RRTS."

6. Roadrunner's financial statements reported $532,209,000 in quarterly revenue for the three months ending on September 30, 2016 and $1,481,273,000 in total revenue for the first nine months of 2016. During the same period, Roadrunner had a market capitalization of over $300 million.

7. Roadrunner provided transportation and logistics services through its operating companies, including Roadrunner Intermodal Services, Inc. ("RRIS") a group of operating companies, including Morgan Southern, Inc. ("Morgan Southern"), a Georgia-based transportation provider that Roadrunner acquired in or around February 2011.

<u>The Defendants & Other Relevant Individuals</u>

8. From in or around July 2014 through in or around October 2015, defendant **BRET**

NAGGS served as Controller for Roadrunner's Truckload segment. **NAGGS** was a licensed Certified Public Accountant ("CPA"). As the Controller for the Truckload segment, **NAGGS** was responsible for overseeing accounting and financial statements for the Truckload segment and approving certain accounting entries in the books and records of Truckload operating companies. In addition, **NAGGS** supervised accounting and finance personnel at operating companies within the Truckload segment.

9.     From in or around 2010 to in or around July 2014, defendant **MARK WOGSLAND** served as Controller for the Truckload segment. **WOGSLAND** was a licensed CPA. As Controller for the Truckload segment, **WOGSLAND** was responsible for overseeing accounting and financial statements for the Truckload segment and approving certain accounting entries in the books and records of Truckload operating companies. In addition, **WOGSLAND** supervised accounting and finance personnel at operating companies within the Truckload segment. From in or around July 2014 to in or around December 2017, **WOGSLAND** served as Roadrunner's Director of Accounting for the Truckload segment, and was responsible for, among other things, consolidating financial results from various operating companies and providing accounting guidance to Roadrunner accounting and finance employees. From in or around July 2014 through in or around October 2015, **WOGSLAND** reported to **NAGGS.**

10.     Executive 1 was an executive who worked in a finance role at Roadrunner's corporate headquarters, and served on Roadrunner's Board of Directors. From in or around July 2014 through in or around October 2015, **NAGGS** reported to Executive 1.

11.     Executive 2 was an executive who worked in a finance role at Roadrunner's corporate headquarters. From in or around 2010 through in or around November 2014, Executive 2 reported directly to Executive 1.

12.     Employee A worked in a finance role at Roadrunner's corporate headquarters from

in or around July 2013 through in or around September 2016.

13.     Employee B worked in finance roles at RRIS in Georgia from in or around 2013 through in or around July 2016. Employee B reported to, among others, **NAGGS** and Employee C, at various times throughout the scheme.

14.     Employee C worked in a finance role at RRIS in Georgia from in or around November 2014 through in or around April 2016. From in or around November 2014 through in or around October 2015, Employee C reported to **NAGGS**.

## Roadrunner's Financial Regulators & Auditors

### The United States Securities and Exchange Commission

15.     The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public. Securities laws, as well as the SEC's regulations and rules for public companies, required that Roadrunner and its directors, officers, and employees, among other things, make and keep books, records, and accounts that accurately and fairly reflected the transactions and disposition of the company's assets, and prohibited the knowing falsification of Roadrunner's books, records, or accounts.

16.     Roadrunner was also required to file annual reports ("SEC Forms 10-K") and quarterly reports ("SEC Forms 10-Q") with the SEC that contained financial statements that accurately and fairly presented the financial condition of Roadrunner, as well as other reports that contained information about Roadrunner's management, Board of Directors, business operations, and performance. Through these reports, Roadrunner disclosed its financial information to Roadrunner's shareholders, independent auditors, regulators, and the investing public. In addition to Roadrunner's reports filed with the SEC, Roadrunner also disclosed its financial information to shareholders and the investing public through press releases, earnings calls, and earnings

announcements.

Roadrunner's Auditors

17.     An auditor is an independent certified public accountant who examines the financial statements that a company's management has prepared. Federal securities laws, regulations, and rules required that an independent auditor examine and report on the financial information that Roadrunner provided to the SEC and the investing public.

18.     From at least in or around 2011 and continuing through at least in or around 2017, a known public accounting firm ("Accounting Firm A") with offices throughout the United States acted as the independent auditor of Roadrunner's financial statements.

19.     Accounting Firm A relied on **NAGGS, WOGSLAND,** Executive 1, and other Roadrunner employees to provide truthful and accurate information about Roadrunner's accounting practices, policies, and financial results. Accounting Firm A obtained information from **NAGGS, WOGSLAND,** Executive 1, and other Roadrunner employees through phone calls, meetings, emails, and file-sharing services. In addition, **NAGGS** provided signed certifications, attesting, among other things, that he was not aware of "any material misstatements, financial or otherwise, which may require disclosure," and that "all transactions [were] properly recorded in accordance with" the relevant accounting rules.

20.     Based in part on the information provided by **NAGGS, WOGSLAND,** and Executive 1, Accounting Firm A also offered an opinion as to whether Roadrunner's annual financial statements fairly presented, in all material respects, Roadrunner's financial position. Accounting Firm A's opinion was signed and filed contemporaneously with Roadrunner's annual SEC Form 10-K.

**Roadrunner's Publicized Earnings Metrics**

21.     Stock market analysts followed and reported on Roadrunner's quarterly financial results. Specifically, in advance of each fiscal quarter, analysts provided quarterly earnings

"guidance," or projections of Roadrunner's anticipated financial results. These projections were primarily calculated as anticipated earnings (or income) per publicly traded share of stock ("earnings per share" or "EPS").

## THE SCHEME TO DEFRAUD

### Overview of the Scheme

22.     From in or around at least 2014, through in or around at least January 2017, **NAGGS**, **WOGSLAND**, and their co-conspirators agreed to:   (a) defraud Roadrunner's shareholders and the investing public; and, (b) mislead Roadrunner's independent auditors and regulators by making and causing others to make false and misleading statements about Roadrunner's financial condition.  As described below, **NAGGS**, **WOGSLAND**, and their co-conspirators used a combination of methods to fraudulently manipulate Roadrunner's publicly reported earnings and mislead Roadrunner's shareholders, independent auditors, regulators, and the investing public about the true nature of Roadrunner's financial condition.

23.     Under the relevant accounting rules, Roadrunner was required to make a good faith estimate of the likelihood that it would collect its receivables, that is, the amounts owed in connection with Roadrunner's provision of goods or services to customers or advances to drivers. Roadrunner was required to "write off" or set "reserves" for amounts it deemed "uncollectible." Thus, when a debt was old or other factors indicated the debt was unlikely to be paid, Roadrunner was required to either write off or reserve for at least a portion of that debt.

24.     Beginning as early as 2014, **NAGGS**, **WOGSLAND**, and their co-conspirators identified misstated accounts and other accounting issues on the balance sheets of RRIS and other operating companies.  Despite learning of these issues, **NAGGS**, **WOGSLAND**, and their co-conspirators furthered the scheme to defraud by, among other things, (a) leaving assets and receivables with little or no actual value on Roadrunner's balance sheet, rather than writing them off or taking appropriate reserves; and (b) deliberately concealing these overstated assets and other

misstated accounts from Roadrunner's shareholders, independent auditors, regulators, and the investing public. In order to further their fraudulent scheme, **NAGGS, WOGSLAND,** and their co-conspirators deliberately left nearly all of these misstated accounts on Roadrunner's balance sheet throughout 2014, 2015, 2016, and into 2017, all while concealing the true nature of the misstated accounts.

Purpose of the Scheme

25.    The purpose of the scheme was for **NAGGS, WOGSLAND,** and their co-conspirators to mislead Roadrunner's shareholders, independent auditors, regulators, and the investing public about Roadrunner's true financial condition in order to: (a) maintain and increase the market price of Roadrunner's stock; and (b) unjustly enrich **NAGGS, WOGSLAND,** and their co-conspirators through the continued receipt of compensation, stock, and other benefits.

<b>NAGGS and WOGSLAND</b> Identify and Conceal from Shareholders Misstated Accounts on<br>Roadrunner's Balance Sheet

26.    Beginning in or around May 2014 **WOGSLAND,** Executive 1, and others identified misstated accounts on the balance sheets of RRIS and several other operating companies, including: (i) understated customer accounts receivable with static balances; (ii) understated and increasing liabilities for advance payments made to drivers; and, (iii) overstated accounts for licenses and other "assets" that no longer had any actual value. Instead of addressing the overstated accounts and bad debts when they were identified, as required under the relevant accounting rules, **NAGGS, WOGSLAND,** and their co-conspirators purposefully left the misstated accounts in place, in order to fraudulently boost Roadrunner's financial performance and mislead Roadrunner's shareholders, independent auditors, regulators, and the investing public.

27.    Specifically, in or around May 2014, Executive 1 identified issues on the RRIS balance sheet, with potential "exposure" of nearly $4.5 million. Executive 1 directed **WOGSLAND,** Executive 2, and Employee A to investigate the RRIS balance sheet.

28.     In or around May 2014, **WOGSLAND** and Executive 2 traveled to RRIS to review the RRIS balance sheet. **WOGSLAND**, Executive 2, and Employee B identified several misstated accounts on the RRIS balance sheet, including:

29.     First, a receivable for an outstanding customer debt of approximately $500,000, which dated back to in or around 2012 and had been static (i.e., without activity) since spring 2013.

30.     Second, accounts purportedly containing over $1.1 million in assets for prepaid taxes and licenses that, in fact, were for prior years and thus had little to no value.

31.     Third, a large and increasing receivable related to Roadrunner's "Lease Purchase" program, which was a program through which drivers leased a vehicle or tractor from a third party. Under the program, to incentivize drivers, many of whom had poor credit, Roadrunner agreed to serve as guarantor on the leases and to advance certain maintenance, fuel, and other costs to drivers. In return, Roadrunner would be reimbursed by deducting money from a driver's pay.

32.     However, by in or around April 2014, **WOGSLAND**, Executive 1, Executive 2, and other Roadrunner management learned that Roadrunner was advancing far more than it was collecting, resulting in large and increasing receivables. As a result, **WOGSLAND**, Employee A, and another Roadrunner finance employee estimated that Roadrunner had $9.7 million in outstanding debt from the Lease Purchase program, and estimated that $3.4 million was "uncollectible," at least in part because many drivers who owed Roadrunner money had left the company, and thus were extremely unlikely to repay the funds in full.

33.     In or around August 2014, **NAGGS** (who started at Roadrunner in July 2014), **WOGSLAND**, and Employee B met to discuss the misstated accounts at RRIS.

34.     **NAGGS**, **WOGSLAND**, and their co-conspirators began to refer to the concerns on the RRIS balance sheet as "unexplained variances," which reflected the difference between the misstated accounts on the RRIS balance sheet versus what **NAGGS**, **WOGSLAND**, and their co-

conspirators believed should have been the correct account balance based on review of the accounts and any supporting documentation.

35. By in or around September 2014, **NAGGS**, **WOGSLAND**, and their co-conspirators had calculated misstated accounts at RRIS totaling over $7.5 million, which, among other things, included: (1) customer receivables; (2) overstated accounts for prepaid taxes and licenses; and (3) Lease Purchase receivables.

36. **NAGGS**, **WOGSLAND**, and their co-conspirators received updates about the misstated accounts. For example, in or around September 2014, **NAGGS** referred to the RRIS financial statements as a "f'd mess." And, in or around November 2014, **NAGGS** described the RRIS balance sheet as "a concocted mess."

37. Instead of writing off the misstated accounts or taking adequate reserves, **WOGSLAND**, **NAGGS**, and Executive 1 directed RRIS finance employees to improperly leave these misstated accounts on Roadrunner's balance sheet and not to make any corrective adjustments to the vast majority of the misstated accounts until being told to do so by Executive 1 or other senior management.

38. In addition to the misstated accounts at RRIS (which included RRIS Lease Purchase receivables), **NAGGS** and **WOGSLAND** also became aware of large Lease Purchase receivables at other operating companies. Again, despite learning that these receivables were, in most cases, increasing, and included historic debt owed by terminated drivers, **NAGGS** and **WOGSLAND** took no action to properly account for these receivables. **NAGGS**, **WOGSLAND**, and their co-conspirators also deliberately concealed from Accounting Firm A that Lease Purchase receivables had been building and had not been properly expensed.

**NAGGS, WOGSLAND, and Their Co-Conspirators Develop a Plan to Write-Off Some of the Bad Debt Over Time in Order to Conceal the Significance of the Misstated Accounts**

39. By late 2014, **NAGGS**, **WOGSLAND**, and their co-conspirators developed a plan

to write off a portion of the misstated accounts as uncollectible. However, instead of immediately writing off the full amount, **NAGGS**, Executive 1, and others directed RRIS finance employees to adjust the balance sheet by a small amount each month, in order to conceal from Roadrunner's shareholders, independent auditors, regulators, and the investing public the true nature and extent of the misstated accounts.

40. On or about February 9, 2015, **NAGGS**, **WOGSLAND**, and Employee C discussed how to implement the plan described above to conceal the write-offs from Accounting Firm A. Employee C asked **NAGGS** how and where to account for the write-off, because he "kn[e]w there [was] some concern about highlighting this, so [he] wanted to get [**NAGGS's**] input." **NAGGS** replied, copying **WOGSLAND**, stating that he "did not want to create a new balance sheet account or P&L account and have it stand out for [Accounting Firm A]." Instead, **NAGGS** and **WOGSLAND** directed Employee C to apply the write-off to accounts that were already known issues, in order to avoid drawing attention to the write-off.

### NAGGS, WOGSLAND, and Their Co-Conspirators Abandon the Plan after Learning That Roadrunner's Financial Performance Had Deteriorated

41. However, in February 2015, after Roadrunner management determined that poor financial performance at other operating companies needed "to be mitigated," **NAGGS** directed RRIS not to take the planned write-off for February and to manually reverse the write-offs it had already taken in 2015. By abandoning the plan to take the write-offs over time, **NAGGS**, **WOGSLAND**, and their co-conspirators falsely inflated Roadrunner's earnings and financial performance. Other than a small write-off in on or around April 2015, **NAGGS**, **WOGSLAND**, and their co-conspirators did not write off or materially adjust the misstated accounts until Roadrunner announced that it would issue restated financial results.

### After Abandoning the Plan to Write Off a Portion of the Bad Debt, NAGGS and WOGSLAND Continue to Conceal Misstated Accounts

42. After abandoning the plan, **NAGGS**, Executive 1, and other Roadrunner

management received monthly financial reports from RRIS, many of which, beginning in May 2015, included profit and loss figures both with and without the planned monthly write-off.

43.     Throughout 2015, **NAGGS**, **WOGSLAND**, and their co-conspirators also deliberately concealed from Accounting Firm A both the misstated accounts at RRIS and the plan to write-off only a portion of the bad debt over 2015.

44.     For example, in or around March 2015, following his discussion with **NAGGS** and Employee C about concealing the write-off from Accounting Firm A, **WOGSLAND** instructed Employee C to provide certain documents regarding receivables to Accounting Firm A, but directed Employee not to send "examples" or documents that could draw attention to the misstated accounts or other accounting issues.

45.     Further, in or around May 2015, **WOGSLAND** sent a spreadsheet summarizing over $14 million in "prior balances" across Truckload operating companies, the majority of which related to the misstated accounts and Lease Purchase receivables.

46.     Despite the fact that **WOGSLAND**, **NAGGS**, and their co-conspirators were internally tracking the misstated accounts, when **WOGSLAND** sent the same spreadsheet of Truckload financial results to Accounting Firm A, he omitted the "prior balances" tab in order to conceal from Accounting Firm A that Roadrunner was tracking the misstated accounts.

47.     In addition, in connection with Roadrunner's Form 10-K and Form 10-Q filings, **NAGGS** signed certifications falsely attesting that all transactions were properly recorded in accordance with the relevant accounting rules and, among other things, that "a review of the collectability of receivables [had] been performed and . . . adequate" reserves existed. **NAGGS** confirmed as part of the certification that he "made all appropriate investigations and reviews and relied upon sources, with a good faith basis for such reliance, which were necessary or useful with respect to matters for which" he did not "have direct knowledge or expertise." **NAGGS** further

confirmed that he "made inquiries of individuals who report to me and/or who have (or whom I reasonably believe to have) knowledge of such matters."

48. Despite knowing that **NAGGS, WOGSLAND**, and their co-conspirators were deliberately concealing the misstated accounts from Accounting Firm A, **NAGGS** signed certifications in or around February, May, and August 2015.

49. **NAGGS, WOGSLAND**, and their co-conspirators continued to receive information about the misstated accounts and Lease Purchase receivables throughout 2015. Throughout 2016 and 2017, **WOGSLAND** continued to receive information about the misstated accounts and Lease Purchase receivables. As a result of the scheme, nearly all of the misstated accounts remained on RRIS's balance sheet until Roadrunner announced restated financial results.

### The Victims

50. Between 2014 and January 2017, Roadrunner's shareholders held over 37 million shares of Roadrunner stock.

51. On January 30, 2017, Roadrunner announced that it had identified "potential accounting discrepancies" and "accounting errors," and that the investing public could no longer rely upon Roadrunner's financial statements from 2014 through the third quarter of 2016. The trading day before the announcement, Roadrunner's stock was trading at $11.74 a share. By February 1, 2017, three days after the announcement, Roadrunner's share price had dropped to $7.54 a share.

52. On January 31, 2018, Roadrunner announced restated financial results. The trading day before the announcement, Roadrunner's stock was trading at $7.14 a share. By February 2, 2018, three days after the announcement, Roadrunner's stock price had dropped to $4.90 a share.

## COUNT 1

**(18 U.S.C. § 371 – Conspiracy to Make False Statements to a Public Company's Accountants, and to Falsify Books, Records, and Accounts of a Public Company)**

53.     Paragraphs 1 through 52 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

54.     From at least in or around 2014 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

**BRET NAGGS**
**and**
**MARK WOGSLAND**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a.     to knowingly and willfully, directly and indirectly take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Roadrunner's financial statements materially misleading, while Accounting Firm A was engaged in performing reviews and audits of Roadrunner's financial statements and preparation of Roadrunner's quarterly and annual reports required to be filed with the SEC, in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2(b); and,

b.     to knowingly and willfully falsify, and cause to be falsified, books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Roadrunner, in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff.

### Purpose of the Conspiracy

55.     The Grand Jury realleges and incorporates by reference paragraph 25 of this

Indictment as a description of the purpose of the conspiracy.

### Manner and Means of the Conspiracy

56.     In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 22 through 52 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

### Overt Acts

In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Eastern District of Wisconsin, and elsewhere, the following overt acts, among others:

57.     On or about April 24, 2014, **WOGSLAND** sent a spreadsheet with the RRIS reserves for bad debt to Employee B and other Roadrunner finance employees, stating this is "NOT the reserve analysis that I am going to use for the auditors," and noting the calculation showed that RRIS was significantly under reserved.

58.     On or about April 24, 2014, **WOGSLAND** sent another version of the RRIS reserve calculations to Employee B and other Roadrunner finance employees, showing RRIS was *over* reserved. **WOGSLAND** stated this was the calculation he would "give to the auditors," while also admitting that the RRIS bad debt reserve was "at least $200,000 too low."

59.     On or about April 24, 2014, **WOGSLAND** sent Accounting Firm A the bad debt reserve calculations for RRIS, falsely showing that RRIS was over reserved.

60.     On or about January 19, 2015, **WOGSLAND** sent Accounting Firm A a spreadsheet of RRIS accounts receivable as of December 31, 2014 that omitted an account that **WOGSLAND** and **NAGGS** had identified as misstated as early as 2014.

61.     Between on or about February 7, 2015 and on or about February 9, 2015, **WOGSLAND, NAGGS**, and Employee C discussed the plan to write off a portion of the misstated accounts over 2015 and how to conceal the plan to write off the misstated accounts from

Accounting Firm A by taking the write-offs from certain accounts.

62. On or about February 25, 2015, in connection with the preparation of Roadrunner's Form 10-K for 2014, **NAGGS** signed a certification attesting that all transactions were properly recorded in accordance with the relevant accounting rules and confirming that **NAGGS** had "made all appropriate investigations and reviews" necessary to completing the certification.

63. On or about February 25, 2015, the certification signed by **NAGGS** was provided to Accounting Firm A.

64. On or about May 4, 2015, in connection with the preparation of Roadrunner's Form 10-Q for the First Quarter of 2015, **NAGGS** signed a certification attesting that all transactions were properly recorded in accordance with the relevant accounting rules and confirming that **NAGGS** had "made all appropriate investigations and reviews" necessary to completing the certification.

65. On or about May 13, 2015, **WOGSLAND** sent a Roadrunner finance employee a spreadsheet of financial results for Truckload operating companies, which contained a tab summarizing over $14 million in "prior balances," the majority of which was attributable to the misstated accounts and Lease Purchase receivables.

66. On or about July 21, 2015, **WOGSLAND** emailed two Roadrunner employees regarding the financial statements of an operating company, directing one of them, in the future, to "not include [Roadrunner's Internal Audit Manager] on an email like this. He is an auditor."

67. On or about August 3, 2015, in connection with the preparation of Roadrunner's Form 10-Q for the Second Quarter of 2015, **NAGGS** signed a certification attesting that all transactions were properly recorded in accordance with the relevant accounting rules and confirming that **NAGGS** had "made all appropriate investigations and reviews" necessary to completing the certification.

68.     On or about October 9, 2015, after conferring with Executive 1 about Roadrunner's financial performance, **NAGGS** told Employee C via email "don't book" the planned write-off on the RRIS balance sheet.

69.     On or about January 26, 2016, **WOGSLAND** sent a Roadrunner finance employee a spreadsheet of financial results for Truckload operating companies, which again contained a tab summarizing over $12.8 million in "prior balances," the majority of which was attributable to the misstated accounts and Lease Purchase receivables.

70.     On or about January 26, 2016, **WOGSLAND** sent Accounting Firm A the same spreadsheet of Truckload financial results, but **WOGSLAND** did not include the "prior balances" tab that tracked the misstated accounts and Lease Purchase receivables, among other items.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

**(18 U.S.C. § 1349 – Conspiracy to Commit Securities Fraud & Wire Fraud)**

71.    Paragraphs 1 through 52 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

72.    From at least in or around 2014 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

### BRET NAGGS
### and
### MARK WOGSLAND

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

    a.    securities fraud, that is, to knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), to wit, **NAGGS**, **WOGSLAND**, and their co-conspirators made, and caused to be made, false and misleading representations to Roadrunner's shareholders and members of the investing public about Roadrunner's true financial condition, in violation of Title 18, United States Code, Section 1348; and

    b.    wire fraud, that is, to knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and

property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

73.    The Grand Jury realleges and incorporates by reference paragraph 25 of this Indictment as a description of the purpose of the conspiracy.

### Manner and Means of the Conspiracy

74.    In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 22 through 52 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 3 - 5

### (18 U.S.C. §§ 1348 and 2 – Securities Fraud)

75.     Paragraphs 1 through 52 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Purpose of the Scheme and Artifice to Defraud

76.     The Grand Jury realleges and incorporates by reference paragraph 25 of this Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

77.     The Grand Jury realleges and incorporates by reference paragraphs 22 through 52 of this Indictment as a description of the scheme and artifice.

78.     From at least in or around 2014 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

### BRET NAGGS
### and
### MARK WOGSLAND

aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally execute a scheme and artifice (a) to defraud any person in connection with any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), to wit, **NAGGS** and **WOGSLAND** made, and caused to be made, false and misleading representations to Roadrunner's shareholders about Roadrunner's true financial condition.

| Count | Defendant | Approximate Date | Description |
|-------|-----------|------------------|-------------|
| 3 | **MARK WOGSLAND & BRET NAGGS** | March 2, 2015 | SEC Form 10-K for Year-ended 2014 |
| 4 | **MARK WOGSLAND & BRET NAGGS** | May 5, 2015 | SEC Form 10-Q for First Quarter 2015 |
| 5 | **MARK WOGSLAND & BRET NAGGS** | August 3, 2015 | SEC Form 10-Q for Second Quarter 2015 |

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNTS 6 - 9

### (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

79. Paragraphs 1 through 52 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Purpose of the Scheme and Artifice to Defraud

80. The Grand Jury realleges and incorporates by reference paragraph 25 of this Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

81. The Grand Jury realleges and incorporates by reference paragraphs 22 through 52 of this Indictment as though fully set forth herein as a description of the scheme and artifice.

### Use of the Wires

82. On or about the dates specified as to each count below, and as to the defendant(s) specified below, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Defendant | Approximate Date | Description of Interstate Wire |
|-------|-----------|------------------|--------------------------------|
| 6 | **MARK WOGSLAND & BRET NAGGS** | January 19, 2015 | Email from **WOGSLAND** routed through Roadrunner's servers in Wisconsin to Accounting Firm A in Minnesota regarding summary of accounts receivable. |
| 7 | **MARK WOGSLAND & BRET NAGGS** | February 9, 2015 | Email from **NAGGS** and **WOGSLAND** routed through Roadrunner's servers in Wisconsin to Employee C in Georgia regarding writing off misstated accounts. |
| 8 | **MARK WOGSLAND & BRET NAGGS** | October 9, 2015 | Email from **NAGGS** routed through Roadrunner's servers in Wisconsin to Employee C in Georgia directing him not to book the balance sheet cleanup for the month. |

| Count | Defendant | Approximate Date | Description of Interstate Wire |
|-------|-----------|------------------|-------------------------------|
| 9 | **MARK WOGSLAND** | January 26, 2016 | Email from **WOGSLAND** routed through Roadrunner's servers in Wisconsin to Accounting Firm A in Minnesota regarding Truckload segment results. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATION
## (18 U.S.C. § 981(a)(1)(C))

83. The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **BRET NAGGS** and **MARK WOGSLAND**, have an interest.

84. Upon conviction of a violation of Title 18, United States Code, Section 371, and/or a violation of, or a conspiracy to violate, Title 18, United States Code, Sections including 1343, 1348, 1349, and, Title 15, United States Code, Section 78ff and, Title 17, Code of Federal Regulations, Part 240.13b2-2, as alleged in this Indictment, the defendants so convicted shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation.

### Substitute Assets

85. If any of the above described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value;

e. or has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

86. All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the

provisions of Title 21, United States Code, Section 853, made applicable by Title 28, United States

Code, Section 2461(c).

A TRUE BILL:

FOREPERSON

Dated: ___June 12, 2018___

MATTHEW D. KRUEGER
United States Attorney

SANDRA L. MOSER
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

HENRY P. VAN DYCK
Assistant Chief
DAVID STIER
CAITLIN R. COTTINGHAM
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

Dated: June 12, 2018